EDWARD S. STOKES, Respondent, *v.* JOHN W. MACKAY and HECTOR DE CASTRO, Appellants.

1. VENDOR AND VENDEE — ACTION FOR PRICE OF BONDS — BONDS PLEDGED BY VENDOR — MOTION FOR A VERDICT. In an action brought by the vendor, upon a partly-executed contract for the transfer of stocks and bonds, to recover the unpaid balance of the stipulated price, a motion by the defendant to direct a verdict upon the grounds that there had been no delivery or tender and no sufficient evidence of a waiver of a tender of the balance of the bonds, called for from the plaintiff by the contract, but that on the contrary the evidence showed that the bonds were pledged with a third party to secure liabilities of the plaintiff, does not amount to a motion to direct a verdict on the ground that the plaintiff was unable to perform by a delivery at the time when tender was offered to be made and when the same was made.

2. BONDS PLEDGED BY VENDOR. In such a case, the fact that the undelivered bonds were pledged to secure liabilities of the vendor-plaintiff is in no wise inconsistent with his ability to redeem, or to procure them for delivery; and if the vendee-defendant believes and intends to make the point that the plaintiff was actually incapable of delivering the balance of the bonds it should be distinctly stated.

3. VENDOR AND VENDEE — DELIVERY. In an action brought by the vendor, S., upon a contract for the transfer of stocks and bonds, constituting certain telegraph properties, which contract had been signed by one of the vendees, D., as the agent or intermediary of the other vendee, M., it appeared that S. had loaned certain of the bonds to D. who had pledged them to a bank to secure a loan to himself, and that S. gave him an order on the bank to deliver the bonds to him, C., when his loan was paid. *Held*, that this was a sufficient and the only possible delivery, and divested S.'s title to the bonds in favor of D. as M.'s agent.

4. CONTRACT OF SALE — REPUDIATION — TENDER. As to the remainder of the bonds not delivered by the vendor, S., to the vendee, M., it appeared that they were under pledge to a third party to secure a loan to S., and that M., while retaining all that S. had transferred under the contract, repudiated the contract, claiming that all the property covered by it was his own, and refused to pay the balance of the stipulated consideration. *Held*, that, under the circumstances, it would have been an unnecessary and meaningless ceremony for S. to go through the form of tendering the remaining bonds, and that, consequently, no tender was called for.

5. CONTRACT OF SALE — ELECTION OF REMEDIES — ACTION FOR PRICE. — RIGHTS OF VENDEE. The complaint in the action brought by the vendor to recover the balance of the contract price of the bonds, kept open a tender of the undelivered bonds, and the plaintiff recovered judgment. *Held*, that by his election to sue upon the contract, the plaintiff had kept alive all his own obligations under it; that no acts done by him after the commencement of the action could affect the cause of action; that the defendant-vendees, upon payment of the judgment, would be entitled to demand the bonds and that a failure to comply would create a cause of action in their favor; that the fact that some of the undelivered bonds remained pledged to others to secure liabilities of the plaintiff proved nothing against his right of recovery, but if he could not redeem them he could be compelled to account for the moneys received for them; and that if any of the bonds had been converted and passed beyond his control, after the commencement of the action and without fault on his part, at most, if at all under the circumstances, he could be compelled to account for their actual value.

Reported below, 82 Hun, 449.

(Argued June 11, 1895; decided October 8, 1895.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 14, 1894, which affirmed a judgment in favor of plaintiff entered upon a verdict of a jury, and also affirmed an order denying defendants' motion for a new trial.

This action was brought to recover the sum of $100,000, less a payment thereon of $25,000, with interest from the 26th day of February, 1889.

The plaintiff alleged in his complaint that prior to the 26th day of December, 1888, he owned and possessed certain bonds and stocks of telegraph companies, for convenience called telegraph properties, and at that time an agreement was entered into between him and the defendants whereby they agreed to purchase the telegraph properties and pay therefor the sum of $100,000 upon the assignment and delivery of such properties to them by him ; that he thereafter assigned and transferred the properties to the defendants and performed the agreement on his part; that thereafter, on or about the 25th day of February, 1889, they paid him the sum of $25,000 as a partial payment, and that the balance, $75,000, remained due to him, and he prayed judgment for that sum with interest.

The defendants answered separately, denying the allegations of the complaint and making certain affirmative allegations against the plaintiff's right to recover.

The first trial of the action resulted in a judgment in favor of the plaintiff upon a verdict directed by the court, which judgment was reversed by this court and a new trial granted on the ground that certain questions of fact should have been submitted to the jury. (See 140 N. Y. 640.)

Upon the second trial, now under review, all such questions were decided in favor of plaintiff.

The facts will be found fully stated in the prevailing opinion on the former appeal and in the opinion herein.

*Joseph Larocque* for appellants. It was incumbent upon the plaintiff, in order to put himself in a position to maintain an action for the recovery of the contract price, to allege and prove either the performance on his part of all things in the contract contained to be performed by him, including the delivery to the defendants of all the securities embraced in the contract, or a good and sufficient tender of the whole of

29

the said securities and his ability to deliver the same. (*Mount* v. *Lyon*, 49 N. Y. 552; *Porter* v. *Rose*, 10 Johns. 299; *Bank of Columbia* v. *Hagner*, 1 Pet. 465; *Topping* v. *Root*, 5 Cow. 404; *Champlin* v. *Rowley*, 18 Wend. 187; *Lester* v. *Jewett*, 11 N. Y. 453; *Smith* v. *Brady*, 17 N. Y. 187; *Catlin* v. *Tobias*, 26 N. Y. 217; *Butler* v. *Butler*, 77 N. Y. 472; *Van Clief* v. *Van Vechten*, 130 N. Y. 571; *McGehee* v. *Hill*, 4 Porter [Ala.], 170; *Shipps* v. *Atkinson*, 36 N. E. Rep. 375; *Dana* v. *King*, 2 Pick. 155; *F. M. Co.* v. *Brown*, 124 U. S. 389; *Nelson* v. *P. F. E. Co.*, 55 N. Y. 480; *Bigler* v. *Morgan*, 77 N. Y. 312; *Eddy* v. *Davis*, 116 N. Y. 247; *Goodrich* v. *Sweeney*, 4 J. & S. 320; *Frost* v. *Knight*, L. R. [7 Exch.] 111; *Johnstone* v. *Milling*, L. R. [16 Q. B. Div.] 460; *Kadish* v. *Young*, 108 Ill. 170; *R. S. Co.* v. *L. F. Co.*, 130 Ill. 660; *Bernstein* v. *Meech*, 130 N. Y. 354; *Weeks* v. *Maillardet*, 14 East, 568; *Moir* v. *Brown*, 14 Barb. 39.) The court below erred in the instruction given to the jury, that the telegrams of themselves are susceptible of an interpretation which would bind Mr. Mackay to the supposed contract in controversy. (*Trustees, etc.*, v. *Bowman*, 136 N. Y. 521; *Glenn* v. *Garth*, 133 N. Y. 18; *Rowan* v. *Hyatt*, 45 N. Y. 138; *Baldwin* v. *Burrows*, 47 N. Y. 199, 212; *Smith* v. *Kidd*, 68 N. Y. 142; *Owings* v. *Hull*, 9 Pet. 629; *Combs* v. *Scott*, 12 Allen, 493, 496; *Benecke* v. *Ins. Co.*, 105 U. S. 355, 360; *Bloomfield* v. *C. O. Bank*, 121 U. S. 135; *R. Mills* v. *R. R. Co.*, 5 Fed. Rep. 852; *McClelland* v. *Whitely*, 15 Fed. Rep. 322; *Dickinson* v. *Conway*, 12 Allen, 491; *Walker* v. *Walker*, 5 Heisk. [Tenn.] 425; *Bank* v. *Drake*, 29 Kans. 311; *Jackson* v. *Badger*, 35 Minn. 52; *Fitzmaurice* v. *Bayley*, 6 El. & Bl. [Q. B.] 868; *Lewis* v. *Read*, 13 M. & W. 834; *Rogers* v. *Kneeland*, 10 Wend. 218.)

*Esek Cowen* and *Joseph H. Choate* for respondent. The motion to direct a verdict for the defendants was properly denied. (*Mount* v. *Lyon*, 49 N. Y. 552.) The point that it did not appear that the plaintiff could have delivered the bonds, even if the defendants had paid the purchase money

claimed in this action, is untenable. It has always been assumed that the plaintiff could have performed on his part if the defendants had been willing to perform on theirs. (*Devoe* v. *Brandt*, 58 Barb. 493 ; *Thayer* v. *Marsh*, 75 N. Y. 340 ; *Hofheimer* v. *Campbell*, 59 N. Y. 269 ; *Binse* v. *Wood*, 37 N. Y. 526 ; *Webb* v. *Odell*, 49 N. Y. 583.) Upon the repudiation of the contract and the waiver of the tender of the bonds by the defendants, the plaintiff had a complete and perfect cause of action. After he had brought this suit, his sole cause of action was for the purchase price, and his rights in this suit could not be affected by any subsequent action with regard to the securities. Nor was he bound to bring them into court as a condition precedent to a recovery. (*Smith* v. *Lewis*, 26 Conn. 10 ; *Westfall* v. *Peacock*, 63 Barb. 209 ; *Morris* v. *Rexford*, 18 N. Y. 552 ; *Moller* v. *Tuska*, 87 N. Y. 170.)

GRAY, J. When this case was reviewed by us upon the prior appeal (140 N. Y. 640), it was decided that there were certain questions of fact, upon the evidence, which should have been submitted to the jury and, because the trial judge had refused to do so and had directed a verdict for the plaintiff, the judgment recovered was reversed and a new trial was ordered. There was a sharp difference in opinion as to the effect of the evidence. It was thought by some of the members of the court that the proof was such as to establish a complete adoption by Mackay of the contract, which De Castro, as his representative or agent, had made for him with Stokes and which provided for the sale and transfer by the latter to Mackay of the bonds and stocks of the United Lines Telegraph Company held by him, or to which he might be entitled, in consideration of the payment of $100,000 and the cancellation of an existing indebtedness. A general outline of the facts may be briefly given. The telegraph interests and properties had been acquired and created by Stokes as the result of a joint venture with Mackay, undertaken in 1884, with moneys furnished by the latter. It had commenced with

the acquisition by Stokes of the Bankers' and Merchants' Telegraph Company's properties and franchises, at a receiver's sale thereof. He reorganized the same into the United Lines Telegraph Company; became its president; received $2,380,000 of the $3,000,000 of capital stock and held, or controlled, the $1,200,000 of first mortgage bonds and added to the company's property by building or purchasing additional telegraph lines. It was the purpose, eventually, when the scheme was ripe, to consolidate this company with the Postal Telegraph Company, of which Mackay was, practically, the owner and for the benefit of which the other properties had been acquired and developed. Either in the securities of the new company to be so formed, or in the profits of the joint enterprise, (it was a question which), Stokes had an interest.

Meanwhile, everything stood in Stokes' name and was in his possession and control. After about four years, Mackay desired to obtain these telegraph bonds and stocks and instructed his agent, De Castro, to procure their transfer by Stokes. Stokes was not unwilling to turn them over; but insisted upon some agreement being made, which should recognize and provide for his interest in the telegraph properties or in the profits of the enterprise. The contract in question was then made and signed by Stokes and De Castro on December 24th, 1888; Stokes delivering to Ingersoll, as a condition of De Castro's signature, a large number of the bonds of the United Lines Company, to be held until Mackay was heard from, in approval, or otherwise, of what his agent had done. The day when the contract was so made, De Castro sent a telegram to Mackay, stating that Stokes had "turned over to Ingersoll $935,000 of bonds and other securities" and had "signed also an agreement which is forwarded and which leaves him out" and that "Ingersoll will turn over to E. C. Platt these securities for custody; this the only way it could be done and I hope it will be satisfactory." Platt, the representative of the Nevada Bank and the financial agent of Mackay here, also, on the same day, telegraphed to him about Stokes having deposited the bonds with Ingersoll

and that " $1,600,000 stock will be assigned and all judgments
turned over on your order as soon as agreement forwarded to
day is signed by you." Mackay did not wait to see the con-
tract, but immediately telegraphed to De Castro: "All right
and satisfactory. I want you to tell Ingersoll to do nothing
in this case except what he knows to be correct and legal, as
I do not want trouble for what has been done in the past, nor
in the future." And to Platt he, also, at once telegraphed :
"All right. You take whatever securities Ingersoll gives
you, as Ingersoll understands this matter fully." Stokes
had not been shown the telegram sent by De Castro on
December 24th ; but was only told by him that he had
telegraphed Mackay about the arrangement. On December
26th, upon De Castro's informing him of Mackay's telegram
that it was "all right and satisfactory," Stokes went
to the company's office and made a transfer in blank of the
23,800 shares of stock which he held and delivered the same
to Townsend for Mackay. The same day De Castro receipted
upon the contract as for the bonds previously delivered to and
held by Ingersoll. The latter then wrote Mackay a letter on
December 26th, informing him of the delivery by Stokes of
the bonds and the stock and enclosing the contract. To this
letter Mackay answered, to the effect that " on looking over
the agreement he saw no necessity for signing it. Some por-
tions of it are wrong ;" that the claim against Read & Co.
(Stokes' firm) " had nothing whatever to do with the tele-
graph business " and that " there is no necessity to make any
change at present except to place the securities with Mr.
Platt for safe-keeping." Subsequently, there were two sig-
nificant occurrences. In the first place, the certificate for the
23,800 shares of stock was filled up with Mackay's name;
thus making the transfer of the stock absolute. Then a loan
of $25,000, secured by Stokes from a bank upon the collateral
security of $100,000 of the United Lines bonds, was paid off
by money obtained from Mackay and the bonds were taken
up and delivered to Platt for Mackay. With this sum of
$25,000 Stokes has credited Mackay, as in part payment of

the $100,000 mentioned in the contract. In March, 1889, Mackay arrived in New York from California and had interviews with Stokes ; in which he refused to recognize, or to be bound by, the contract of December and repudiated the transaction, demanding that plaintiff account to him with respect to their past financial transactions. But, instead of restoring the securities, which Stokes had turned over upon the faith of the contract of December, he insisted upon his right to them and that Ingersoll should deliver to him what he held. Mackay claimed that an arrangement was made, by which Stokes agreed that the securities might be turned over ; that he would account to him as to their past financial transactions and that he would rely upon Mackay's generosity as to any compensation for his interest in the telegraph properties. That was the position taken by Mackay ; while it was claimed by Stokes that a contract had been entered into by Mackay in December, which was binding upon the latter and which had been mostly executed on his part by a delivery of the bonds and of the controlling interest in the capital stock. In brief, Stokes occupied the position of Mackay's having become obligated to him under the December contract ; either by reason of the telegrams sent in response to the communications of his agents in relation to the arrangement with Stokes, or by force of his subsequent conduct in adoption of that arrangement, by the retention and ultimate acceptance of its benefits. The proof is that Stokes had turned over, practically, all of the great property in his possession and that Mackay had received it ; and the verdict establishes that it was in pursuance of the agreement between them, which obligated the latter to pay a certain consideration and canceled the existing indebtedness referred to.

The evidence upon the last trial does not, essentially, differ from that given upon the first trial and the jury have now decided in plaintiff's favor all the questions of fact, which were deemed, in the prevailing opinion rendered in this court, to arise upon the evidence. They were, in substance, whether

the meaning of Mackay's telegram was that he would be bound by the December contract; whether he had ratified and adopted it; whether Stokes had agreed to abandon it and to rely solely upon Mackay's generosity for his compensation. It was said in the former opinion, " the ultimate issue to be determined is whether Mackay became bound as a party to the agreement signed by Stokes and De Castro by ratification, adoption, or estoppel and all the evidence bearing upon that issue should be fairly submitted to the jury for their determination." In view of the opinion of this court and of the decisive character of the verdict of the jury, in settling the questions upon which the parties were in conflict, the controversy should be considered as having ended with the result of the trial and the error must be both serious and plain, which should influence us to reverse the judgment, which the plaintiff has again recovered, and to direct a further trial of the issues.

The appellants insist that several errors were committed in rulings made by the learned trial judge upon questions of evidence and in his instructions to the jury. We think it only necessary to refer to the contention that the plaintiff failed to make any tender of certain of the United Lines Company's bonds prior to the commencement of his action and that he did not show that he was able actually to deliver them to Mackay, had the latter been willing to accept a delivery. These propositions have reference to the fact that Stokes had pledged some of the bonds to secure loans of moneys and the argument is, assuming that the evidence justified the jury in believing their tender to have been waived, nevertheless, that it was incumbent upon Stokes, affirmatively, to establish the fact that he was in a position to redeem the bonds and able actually to deliver them to Mackay, upon the latter's paying the balance of $75,000 claimed by Stokes as due upon the contract. This phase of the contention between the parties is claimed to have been made to appear by the motions of the defendants to dismiss the complaint and to direct a verdict. The motion to dismiss was made upon the general ground that

the plaintiff had failed to establish his alleged cause of action and it did not specify, or call to the attention of the court, that, or any other particular point. It was, therefore, an insufficient basis upon which to predicate error with respect to some feature of the trial, not necessarily suggested by the language used. The motion to direct a verdict was based upon three grounds; two only of which have relation to the present point. They were that there had been no delivery and no tender, and no sufficient evidence of a waiver of a tender, of the $115,000 of United Lines Telegraph bonds, which were shown to have been pledged with the Chemical Bank; that those bonds, as appeared by the evidence, had to a considerable amount been subjected by the plaintiff to further and different liabilities and by the plaintiff's voluntary act passed from his control.

" *Third.*— Upon the ground that there had been no delivery and no tender and no excuse for non-delivery of the bonds which had been, according to the testimony in the Madison Square Bank. On the contrary, it appeared from the evidence that after the time it is alleged that the contract sued upon was made, the plaintiff himself was borrowing money and creating a burden upon these bonds for the payment of his own obligations, and that if any tender had been in point of fact made or proposed, the same had not been kept good as required by law."

While the effect of the motion was to raise the question of tender and of the sufficiency of the evidence to justify a finding that a tender had been waived, it does not suggest the point that the plaintiff was unable to perform by a delivery, at the time when tender was offered to be made and when the same was waived. The fact that the bonds were pledged to secure liabilities of the plaintiff was in no wise inconsistent with plaintiff's ability to redeem, or to procure them for delivery to the defendants. If the defendants believed, and intended to make the point, that the plaintiff was actually incapable of delivering the small balance remaining of the bonds, it should have been distinctly stated. The plaintiff

having given evidence of his willingness to turn over the remaining bonds, if defendants would pay the $75,000 due by the contract, and that their formal tender was waived, he had, *prima facie,* established the breach by the defendants of the contract relied upon and that it was owing, not to some default on his part, but to Mackay's refusal to be bound by the terms of the contract, or to recognize that any rights had accrued to the plaintiff by reason of the transactions between them. Manifestly, in that attitude of the parties, the plaintiff was not called upon to establish the fact that had the defendants not waived a tender and a tender had been necessary, he possessed ways and means to produce and present the bonds for acceptance or refusal. Whatever was the real condition of his finances, there was nothing to warrant the inference of an inability to redeem the bonds and if presumptions were to be indulged in, the presumption of plaintiff's ability to perform his agreement and to have the means to do so obtained, until overcome by evidence to the contrary. It is very clear, under the circumstances disclosed, if at all essential, that it was incumbent upon the defendants to make out the fact, which they wholly failed to establish, that the plaintiff was incapable of redeeming the bonds for delivery. It is equally clear that they did not entertain a notion, which was not suggested upon the trial either by motion, or by a request for an instruction to the jury, or in any other manner.

The only point suggested by the motion to direct a verdict was that there had been no tender of the bonds and that defendants had not waived a tender and, as bearing upon the efficacy of the tender to relieve the plaintiff of the duty resting upon him, it was stated that the bonds were pledged to secure liabilities of the plaintiff and had thus passed from his control. The defendants claim that there were $165,000, par value, of those bonds, which, at the time of the commencement of the action, had not been delivered by the plaintiff. According to the plaintiff's evidence, between the time when he was given to understand that Mackay approved of his agent's negotiation and contract, in December, 1888, and

when in March, 1889, Mackay came on to New York, all the telegraph properties had been turned over which were in his possession, except $115,000 of the bonds. $50,000 of the bonds had been loaned to De Castro and he had pledged them in October, 1888, to the Madison Square Bank, to secure a loan to himself. On December 26th, 1888, Stokes gave De Castro an order on the bank to deliver the bonds to him, De Castro, when his loan was paid. As one of the vendees named in the contract of December 24th, 1888, and as the agent or intermediary of Mackay, this was a sufficient and the only possible delivery and divested Stokes' title to the bonds in favor of De Castro, as Mackay's agent. As to the $115,000 of bonds, they were under pledge to secure a loan to Stokes from the Chemical Bank and Mackay's position towards Stokes and his declarations to him after his arrival in New York made it unnecessary to do anything about getting them up. He refused to recognize the contract as binding upon him, and simply claimed all the telegraph properties to be his. His attitude was one of distinct repudiation of any obligations towards Stokes. The latter was in the position of having turned over substantially all the property in his possession and then of hearing Mackay disavow the contract upon the faith of which he had acted. He had divested himself of the control of the telegraph company and of the great bulk of the securities and properties, of which he had become possessed, and stood ready to fulfill every condition; while Mackay, who had seen him give up everything, refused to pay the cash consideration named in the contract. His course was plain. There was a breach of the contract. He had lost the control of the telegraph company and had delivered most of the property called for by the contract. He could elect to rely upon the responsibility of the vendees and sue them upon the contract for what remained to be paid by them of the consideration moneys. This he did and his offer to make a tender of the bonds yet undelivered, before suit, was expressly waived by De Castro as useless. Indeed, in view of Mackay's express repudiation of the contract, it would have

been an unnecessary and meaningless ceremony for Stokes to go through the form of tendering the remaining bonds and no tender was called for. · (*Cornwell* v. *Haight*, 21 N. Y. 462; *Shaw* v. *Republic Ins. Co.*, 69 id. 286.) In the latter case the English rule deducible from the cases was adverted to, that "the positive, absolute refusal by one party to carry out the contract is in itself an immediate complete breach of it on his part and dispenses the other party from the useless formality of tendering performance of the condition precedent and gives immediate right of action," and it was held that while our decisions may not have gone so far as those of the English courts, yet that where a party has repudiated all obligation, and so declares, it would be "a useless act" after that to make an offer to perform. The law does not compel a man to do a vain and fruitless act.

The situation of the parties was sharply defined. Stokes claimed that a contract had been made with De Castro and Mackay, under which he had substantially performed what was required of him, and that Mackay had become bound, either by his telegrams or by subsequent adoption and ratification. Mackay, on the other hand, repudiated any obligation under the contract; claimed the telegraph properties were his without any payment and that Stokes had given up all his interests, relying upon his, Mackay's, generosity as to compensation. Stokes, therefore, elected to sue him upon the contract, and in affirmance thereof, to recover that portion of the cash consideration which remained unpaid. That fixed the rights of the parties and presented distinct issues for trial; which would result, either in a decision that Mackay was not bound in any way by the contract and that Stokes had gained no rights thereunder, or had abandoned them; or that a contract had been validly made, by the terms of which Mackay had become obligated and that Stokes had done everything on his part which entitled him to enforce that obligation and to recover the moneys demanded. The evidence was such as, in the former judgment of this court, to require the submission of the case to a jury, and they have

decided the contention by their verdict in favor of Stokes; and all questions of fact essential to Stokes' recovery will be deemed to have been passed upon favorably.

No acts done by the plaintiff after the commencement of the action could affect the cause of action ; for the right of action had become vested upon the breach of the contract. That breach consisted in the repudiation of a contract, then substantially executed, and in the refusal to pay the contract price, while retaining practically all the property sold and delivered under the contract.    The plaintiff's subsequent acts could only create a cause of action in favor of the defendants.    Under the allegations of the complaint, the defendants might, at any time, after the action was commenced, have demanded the bonds yet undelivered, upon offering to pay the $75,000 claimed from them.    If their delivery had become impossible to the plaintiff, the defendants would have had the right to compel him to account for what he could not deliver ; but nothing which might happen to the bonds after the right of action had vested, and was availed of, could divest such right of action.    ( *Westfall* v. *Peacock*, 63 Barb. 209.)    That some bonds remained pledged to others to secure liabilities of the plaintiff, proves nothing against his right of recovery.    If he could not redeem them, he could be compelled to account for the moneys received for them.    If any had been converted and passed beyond his control, after the commencement of the action and without fault on his part, at most, if at all under the circumstances, he could be compelled to account for their actual value.    The rule is not questioned that by the election to sue upon the contract for the price, the plaintiff has kept alive all his own obligations under it.    He recognized them by offering to make tender of what bonds he had not yet delivered and by keeping the tender open in his complaint.    The defendants have at all times been entitled, upon offering to pay the $75,000, to have the bonds.    Their payment of this judgment will leave them still entitled to demand them and a failure to comply will create a cause of action in their favor for their value.

We have considered the main question on this appeal with great care, and we think that neither in the rulings upon which it arose, nor in any other of the rulings referred to, was there any error committed which would justify us in ordering a new trial of the action.

The judgment should be affirmed, with costs.

All concur, except HAIGHT, J., not voting.

Judgment affirmed.