[993 NYS2d 462]

TRILEGIANT CORPORATION, Plaintiff, v ORBITZ, LLC, et al., Defendants.

Supreme Court, New York County, August 20, 2014

**APPEARANCES OF COUNSEL**

*Morgan, Lewis & Bockius LLP* (*Brian A. Herman* of counsel) for plaintiff.

*Baker & Hostetler LLP* (*Sammi Malek* of counsel) for defendants.

### OPINION OF THE COURT

CHARLES E. RAMOS, J.

In motion sequence 008, plaintiff Trilegiant Corporation moves for summary judgment with regard to the three remaining affirmative defenses advanced by defendants Orbitz, LLC and Trip Network, Inc. (collectively Orbitz) for: lack of consideration (affirmative defense 10), that it was not "ready, willing and able" to perform (affirmative defense 12), and breach of warranty (affirmative defense 15).

### Background[*]

Orbitz offers online travel services, including but not limited to providing discounted hotel, flight and rental car rates. Trilegiant is also in the business of online travel services, however, their services are primarily subscription-based where they offer future travel discount programs.

In October of 2005, Trilegiant and Orbitz entered into a business agreement by executing the Master Services Agreement (MSA) which provided "for marketing services between Trilegiant and Orbitz from the date of the MSA's execution through December 31, 2010" (Trilegiant's rule 19-a statement ¶ 4). These marketing services, known as DataPass, involved Orbitz's marketing of Trilegiant's services to Orbitz's customers at the conclusion of their travel booking on Orbitz's website.

The marketing arrangement between the parties was arranged so that when a customer enrolled in Trilegiant's services, Orbitz would then transfer the customer's billing and credit card information to Trilegiant, and thereafter Trilegiant would charge the customer and pay Orbitz a designated commission per customer (MSA, schedules F, G, H). As a result of DataPass, customers were charged for Trilegiant's services without affirmatively providing their credit card information to Trilegiant, though arguably they had agreed to be charged when purchasing travel arrangements on Orbitz's site. Eventually, customers of Orbitz complained that their credit cards were being charged without their knowledge.

In June 2007, Orbitz informed Trilegiant that it would be terminating the MSA, effective December 31, 2007 (Orbitz's

---

[*] The facts set forth herein are taken from the parties' statements and rule 19-a submissions, which are undisputed except where noted.

answer to Trilegiant's rule 19-a statement at A, ¶ 6). The MSA allowed for early termination provided that Orbitz pay a series of 35 quarterly termination payments totaling $18,453,000 beginning in 2008, with the final payment due September 30, 2016 (*see* MSA, exhibit B).

In 2010 Trilegiant ceased DataPass activities, as did many other marketers using the practice. Congress undertook an investigation into DataPass and enacted the Restore Online Shoppers' Confidence Act (15 USC § 8401 *et seq.*) (ROSCA) on December 29, 2010, two days before the MSA was originally set to expire.

Orbitz stopped making all termination payments after its payment on March 30, 2010, claiming that the termination payment provision was purportedly designed to compensate Trilegiant for revenue it would have lost as a result of Orbitz's cancellation and, since Trilegiant was no longer involved in DataPass after 2010, Orbitz was not required to make termination payments. Trilegiant then brought this action against Orbitz for breach of contract.

This motion involves 3, in a series of 17, affirmative defenses asserted by Orbitz, whereby Trilegiant moves for summary judgment.

## Discussion

### Orbitz's Tenth Affirmative Defense

Orbitz has raised the affirmative defense of lack of consideration. Orbitz contends that there had to be consideration for each quarterly termination payment and that Trilegiant's continued use of DataPass is necessary to its claim against Orbitz. Orbitz argues that the consideration for the termination payments was supposed to be Trilegiant's forfeit of potential earnings, earnings that Trilegiant cannot forfeit if it is not in the business of DataPass (*see* Orbitz's mem of law at 8-9).

The law does not support Orbitz's argument. It is well settled that an agreement "should be interpreted as of the date of its execution, not the date of its breach" (*X.L.O. Concrete Corp. v Brady & Co.*, 104 AD2d 181, 184 [1st Dept 1984]). Additionally, "[i]f there is consideration for the entire agreement that is sufficient; the consideration supports . . . every other obligation in the agreement" (*Sablosky v Gordon Co.*, 73 NY2d 133, 137 [1989]). A single promise "may be bargained for and given as the agreed equivalent of one promise or of two promises

or of many promises. The consideration is not rendered invalid by the fact that it is exchanged for more than one promise" (2-5 Corbin on Contracts § 5.12).

Considerations of public policy also support this conclusion, because a promisor should not be permitted to renege on a promise either because that specific promise lacks textually designated consideration or because the promisor wants to avoid performance of multiple obligations when the promisee has already performed and has no further obligations concurrent with the promisor's performance (*see* 15 Williston on Contracts § 45:7 [4th ed 1990]).

While Orbitz contends that Trilegiant has been unable to forfeit earnings from new DataPass customers since it ceased the practice in January 2010, that fact has no bearing on whether there was consideration for the termination payment provision in the MSA. The termination payments were part of the original MSA (*see* MSA, exhibit B), and Trilegiant is correct when it asserts that the existence of consideration for the MSA itself, whether "consist[ing] of either a benefit to the promisor or a detriment to the promisee" (*Weiner v McGraw-Hill, Inc.*, 57 NY2d 458, 464 [1982]), is not a disputed material fact in this case.

Additionally, courts do not look to the adequacy of consideration provided that there was consideration, "[a]bsent fraud or unconscionability" (*Apfel v Prudential-Bache Sec.*, 81 NY2d 470, 476 [1993]). There are no allegations that the MSA was fraudulently agreed upon or that it is unconscionable. Further, this court has already held that the termination payments in the MSA do not constitute a penalty or unenforceable liquidated damages (*see* NY St Cts Electronic Filing [NYSCEF] Doc. No. 97 ¶ 5, order entered Dec. 24, 2013, https://iapps.courts.state. ny.us/nyscef/CaseSearch [complete CAPTCHA, search by case index No. 651850/2011, click on index No. hyperlink]).

As this court has previously stated, if these sophisticated parties to the original MSA wanted Orbitz's promise to pay each quarterly termination payment to be contingent on Trilegiant's continued use of DataPass and subsequent forfeiture of revenues, they could have so stipulated in the MSA (*see* NYSCEF Doc. No. 89 at 6, entered Oct. 7, 2013). This court finds that Orbitz's promise to pay all quarterly termination payments is supported by the same bargained-for consideration given by Trilegiant in exchange for Orbitz's various promises in the MSA as a whole.

## Orbitz's Twelfth Affirmative Defense

Orbitz argues that Trilegiant does not have standing to bring this action because Trilegiant fails to show that it was ready, willing and able "to perform its obligations" under the MSA (Orbitz's mem of law at 10).

A non-repudiating party need not tender performance in order to sue on the contract, but it "must be ready, willing and able to perform" (*Pesa v Yoma Dev. Group, Inc.*, 18 NY3d 527, 532 [2012] [emphasis omitted], quoting *Deforest Radio Tel. & Tel. Co. v Triangle Radio Supply Co.*, 243 NY 283, 293 [1926]). Even if the repudiating party's actions "reliev[ed] plaintiff of its obligation to tender performance, plaintiff was nevertheless required to show that it was ready, willing and able to perform" (*Madison Invs. v Cohoes Assoc.*, 176 AD2d 1021, 1022 [1991]). Both *Pesa* and *Madison Invs.* dealt with contracts covering single transactions, specifically contracts for the purchase of real estate.

While Orbitz correctly asserted at oral argument that "ready, willing and able" is not exclusively a real estate concept (*see* Trilegiant tr at 6, lines 21-26; at 7, lines 2-6), the purpose of applying this concept is to determine causation, i.e., to determine whether the breaching party actually caused the non-breaching party's damages. The Court of Appeals articulates this in *Pesa*: "It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach— i.e., where the transaction would have failed, and the damage would have been suffered, even if no breach occurred" (18 NY3d at 532).

In *Pesa*, plaintiff purchasers brought a claim against defendant seller after defendant cancelled contracts to sell real estate to plaintiffs (*see id.* at 530-531). Defendant argued that there had been no movement towards closing in years and that plaintiffs "could not recover damages because they had failed to show that they were ready, willing and able to close" (*id.* at 531). The Court reasoned that the purpose of determining whether plaintiffs were "ready, willing and able" to close was to determine whether defendant had actually caused plaintiffs' damages, and that "[t]he real question is one of burden of proof" (*id.* at 532). Because the plaintiffs could "more readily produce evidence of their own intentions and resources, it [was] reasonable to put the burden on them" to show that they could have performed and thus defendant really did cause their damages (*id.*).

Similarly, the question here with regard to Orbitz's twelfth affirmative defense is whether Orbitz caused the damages that Trilegiant is seeking. It is undisputed that Orbitz did cause Trilegiant's damages through its failure to pay the quarterly termination fees under the MSA.

In *American List Corp. v U.S. News & World Report* (75 NY2d 38 [1989]), plaintiff sued for breach of a contract for marketing services to be provided over a period of 10 years. The Court determined that the damages sought by plaintiff were "general damages," damages that were within the contemplation of the parties and were "the natural and probable consequence of the breach" (*id.* at 43). The Court found that defendants had failed to pay plaintiff "a specific amount over a period of 10-years—a sum *explicitly stated in the contract schedule* to be $3,027,500 and thus unquestionably within the contemplation of the parties" (*id.* at 44 [emphasis added]). Similarly, Orbitz took on a specific obligation to pay $18,453,000 over 35 quarters in the event of its early termination of the MSA.

The Court in *American List Corp.* held that with regard to a suit where the contract provided for several years of ongoing services and payments, "[t]he nonrepudiating party need not, however, tender performance nor prove its ability to perform the contract in the future" (*id.*) because plaintiff, as Trilegiant does in this case, sought general damages, aiming "only to recover moneys which defendant undertook to pay under the contract, thereby assuming a definite obligation" (*id.* at 43).

The decision in *Pesa* is "not inconsistent with [the] decision in *American List Corp.*" because the plaintiffs in *Pesa* only needed to "show that they would and could have closed the *transaction* if the seller had proceeded to a closing as the contract required," whereas the plaintiff in *American List Corp.* was claiming only general damages and would have hypothetically been required to prove it was able to perform for the remainder of the 10-year contract, a burden the Court had found to be "perhaps impossible" (*Pesa* at 532, 533 [emphasis added]).

Orbitz argues that its early termination in 2007 triggered the MSA liquidated damages remedy and that even though Trilegiant was relieved of its obligation to perform it still had to show it was able. Orbitz further argues that Trilegiant has adduced "no evidence whatsoever to prove that it was ready, willing, and able to perform its obligations under the MSA as of the time Defendants stopped making payments in 2010" (Orbitz's mem of law at 10).

Whether the remedy constitutes liquidated damages or a separate provision of the MSA that establishes new obligations for Trilegiant and Orbitz whereby Orbitz is obligated to make quarterly payments and Trilegiant essentially is obligated only to collect them, is irrelevant in light of the fact that Trilegiant claims only general damages, which "include money that the breaching party agreed to pay under the contract" (*see Biotronik A.G. v Conor Medsystems Ireland, Ltd.*, 22 NY3d 799, 805 [2014] [internal quotation marks omitted], citing *Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.*, 487 F3d 89, 109 [2d Cir 2007]).

 Trilegiant is not required to show its ability to perform through September 30, 2016, the date of the final quarterly termination payment. Even if, arguendo, Trilegiant was required to show it could have performed its obligations under the MSA, Orbitz's argument that those obligations would have included an ability to perform DataPass is unpersuasive. Whether exhibit B of the MSA constitutes liquidated damages or a separate provision of the contract, Trilegiant is not textually obligated to do anything except *not* market to Orbitz's customers.

Furthermore, liquidated damages clauses benefit both potential plaintiffs "who [are] relieved of the difficult, if not impossible, calculation of damage, item by item" and potential defendants "who [are] insulated against a potentially devastating monetary claim in the event" of a breach and "[t]hus, public policy is served by the implementation of such clauses" (*X.L.O. Concrete Corp.* at 186).

Because Orbitz agreed to the provisions of the MSA, exhibit B and because Trilegiant is seeking only those specific moneys, Trilegiant does not need to show that it was "ready, willing and able" to perform in order for the MSA to be enforceable against Orbitz, and as such Orbitz's twelfth affirmative defense fails.

## Orbitz's Fifteenth Affirmative Defense

Orbitz's contends that Trilegiant violated a warranty provision in the MSA in which the parties promised that "performance of this Agreement and the applicable Service Agreements does not violate any law, third party right or agreement to which it is a party" (MSA § 6.1).

Orbitz argues that there is "significant evidence suggesting that Trilegiant breached the warranty provision" (Orbitz's mem of law at 12). However, Orbitz refers only to ROSCA as the source of such suggestive evidence.

■ While Orbitz contends that Trilegiant and similar Data-Pass practitioners "violated the rights of millions of Americans" (Orbitz's response at 13), ROSCA does not refer to the violation of consumers' "rights" when it describes the actions of third-party sellers, such as Trilegiant, who purchased consumers' credit card information (15 USC § 8401 [2]). ROSCA's findings instead refer to DataPass as something that undermined consumer confidence and "defied consumers' expectations" (id. § 8401 [2], [7]).

This court has already held that ROSCA does not make any violating contracts unenforceable and the MSA is enforceable despite DataPass being presently illegal (see NYSCEF Doc. No. 89 at 5, entered Oct. 7, 2013). Moreover, as this court has already explained, "the primary purpose of ROSCA was to protect consumers (15 USC § 8401), not marketers that were using DataPass as a tool" (NYSCEF Doc. No. 89 at 6, order entered Oct. 7, 2013, citing Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d 124, 127-128 [1992]).

Orbitz claims that Trilegiant has failed to show that it was not in violation of section 6.1 of the MSA, based on the concept that an "express warranty is as much a part of the contract as any other term" (CBS Inc. v Ziff-Davis Publ. Co., 75 NY2d 496, 503 [1990]).

A breach of warranty claim is established "once the express warranty is shown to have been relied on as part of the contract," and the claiming party then has "the right to be indemnified in damages for its breach . . . [and] the right to indemnification depends only on establishing that the warranty was breached" (id. at 503-504).

Orbitz argues that there are disputed issues of fact as to Trilegiant's alleged breach of warranty, but Orbitz has not alleged damages for which it could be indemnified nor has it alleged any evidence of Trilegiant's breach of warranty that is not rooted in ROSCA's condemnation of DataPass. This court has already held that ROSCA's enactment and findings do not relieve Orbitz from its obligations under the MSA, holding that "[a]s a general rule also, forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as a sword for personal gain rather than a shield for the public good" (NYSCEF Doc. No. 89 at 4, entered Oct. 7, 2013 [internal quotation marks omitted], quoting Lloyd Capital Corp. at 128).

Orbitz tries to use ROSCA's findings that DataPass was bad for consumers and the economy and Trilegiant's cessation of

DataPass activity as evidence of conduct that would violate MSA § 6.1. These allegations do not create a question of fact. This court has already held that "ROSCA does not provide that any violating contracts are rendered unenforceable or that its provisions were intended to apply retroactively" (*see* NYSCEF Doc. No. 89 at 5, entered Oct. 7, 2013), and Trilegiant ceased DataPass almost a year before ROSCA made the practice illegal.

Orbitz cites *Hecht v Components Intl., Inc.* (22 Misc 3d 360 [Sup Ct, Nassau County 2008]), arguing that Trilegiant must prove it "did not breach any representation or warranty" so as to be entitled to summary judgment (*Hecht* at 364). However, the plaintiff in *Hecht* had made "clear, unequivocal promises set forth in the agreement" about the financial condition of a corporation, and defendant relied to its detriment upon such warranty in the making of a buyout agreement with plaintiff (*id.* at 366). The factual dispute in *Hecht* arose out of the extent to which plaintiff disclosed pending lawsuits and debt, not the existence of such, and the court denied plaintiff summary judgment because he could not show that defendant "did not believe that it was purchasing [plaintiff's] promise as to the truth of these warranties" (*id.*).

*Hecht* does not apply to the instant matter because Orbitz fails to bring evidence of conduct by Trilegiant in violation of section 6.1 of the MSA and that Orbitz was damaged in their reliance upon the truth of Trilegiant's promise in section 6.1. Further, there is an absence of any allegations or reference to a specific incident whereby Trilegiant allegedly breached section 6.1 of the MSA.

As such, Trilegiant has made a prima facie showing that it fulfilled its obligations under the MSA, including its promises in section 6.1, and Orbitz, as "the party opposing . . . summary judgment," has failed "to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial" (*Hecht* at 364, quoting *Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

Therefore, this court concludes that the terms of the MSA should be enforced.

Accordingly it is, ordered that the plaintiff's motion for summary judgment be granted in its entirety.