DeForest Radio Telephone and Telegraph Company, Respondent, *v.* Triangle Radio Supply Co., Inc., Appellant.

DeForest Radio Telephone and Telegraph Company, Respondent, *v.* Radio Stores Corporation, Appellant.

Contract — sale — where one party to a contract repudiates it the other party is excused from further performance — action to recover money due for goods delivered — counterclaim for damages arising from plaintiff's prior repudiation of contract improperly dismissed — defendant not obliged to make payment coming due after breach of contract on part of plaintiff.

1. Where one party to a contract repudiates it and refuses to perform, the other party by reason of such repudiation is excused from further performance, or the ceremony of a futile tender. He must be ready, willing and able to perform, and this is all the law requires. He is not obliged to go further and perform in the face of a flat refusal and rejection by the other party.   Especially is this so in a case where the vendee knows that the vendor is unable to perform, and the latter has so stated.

2. In an action to recover for goods delivered under a contract, whereby plaintiff agreed to furnish its manufactured products to defendant and the latter agreed to sell the same and pay therefor in accordance with terms set forth, where it appears that after delivery of the goods in question but before payment was due, plaintiff, being unable, owing to an injunction, to continue furnishing its products, notified defendant of the fact and that it considered the contract at an end, whereupon defendant notified plaintiff that it refused to consider the contract terminated and stood upon its rights, it is error to dismiss a counterclaim, by the defendant for its damages, on the theory that defendant, while insisting upon the continuing validity of the contract, was bound to perform on its part by paying the amount due and by failing to pay this money also broke the contract and, therefore, could not recover for plaintiff's breach. An argument that payment should have been made in face of the continuing breach, even though the plaintiff would be under the duty in law and good morals to pay it back to the defendant as damages finds no support

in law or reason. When the plaintiff repudiated its contract and thereafter refused and was unable to perform, the defendant was not obliged to pay the amount coming due thereafter, and it being conceded that it was ever ready, willing and able to make the payment upon retraction by the plaintiff, there was no breach of contract on its part.

*DeForest Radio Telephone & Telegraph Co.* v. *Triangle Radio Supply Co.*, 215 App. Div. 703, reversed.

*DeForest Radio Telephone & Telegraph Co.* v. *Radio Stores Corporation*, 215 App. Div. 703, reversed.

(Argued May 25, 1926; decided July 9, 1926.)

APPEAL in each of the above-entitled actions, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered November 17, 1925, unanimously affirming a judgment in favor of plaintiff entered upon a verdict directed by the court.

*Herbert R. Limburg, David Podell* and *Louis B. Davidson* for appellant. Triangle was entitled to offset the amount due against the greater amount of damages to which it was entitled by reason of DeForest's breach. (*Sperry & Hutchinson Co.* v. *O'Neill-Adams Co.*, 185 Fed. Rep. 231; *Frankfurt-Barnett Co.* v. *Prym Co.*, 237 Fed. Rep. 21; *Burgie* v. *Hicks*, 203 Fed. Rep. 340; *Robertson* v. *Davenport*, 27 Ala. 574; *Wiegel* v. *Road Improvement Dist.*, 142 Ark. 434; *Central Lumber Co.* v. *Arkansas Valley Lumber Co.*, 86 Kan. 131; *Wellington Piano Case Co.* v. *Garfield & Proctor Coal Co.*, 236 Mass. 544; *Hjorth* v. *Lea Mach. Co.*, 142 Minn. 387; *Balcom* v. *Kohno*, 215 Pac. Rep. 17; *Bradley* v. *King*, 44 Ill. 339.) DeForest having unequivocally repudiated the contract and never having retracted such repudiation, Triangle could recover the damages caused to it without further performance on its part. It was required only to be ready, able and willing to perform; and this is so whether or not the contract had been " kept alive." (Williston on Contracts,

§ 1337; Williston on Sales [2d ed.], 584; *Lagerloef Trading Co., Inc.,* v. *American Paper Products Co.,* 291 Fed. Rep. 947; *Elterman* v. *Hyman,* 192 N. Y. 113; *Hochester* v. *De La Tour,* 2 El. & Bl. 678; *O' Neill* v. *Supreme Council,* 70 N. J. L. 410; *Holt* v. *United Security Life Ins. Co.,* 74 N. J. L. 795; 76 N. J. L. 585; *Frost* v. *Knight,* L. R. 7 Exch. 111; *Johnstone* v. *Milling,* 16 Q. B. Div. 460; *Clark* v. *Marsiglia,* 1 Denio, 317; *Delaware Trust Co.* v. *Calm,* 195 N. Y. 231; *Rosenthal* v. *National Folding Box & Paper Co.,* 226 N. Y. 313.)

*Samuel Seabury, George Trosk* and *Hyman Dominitz* for respondent. The defendant expressly and unequivocally elected in writing to keep the contract alive, and thereby remained obligated to perform it. While the contract was thus in full force and effect, it defaulted in the payment of large sums due for goods sold and delivered to it by plaintiff. Under the contract the plaintiff had the right to and did cancel the contracts because of these defaults. (*Rosenthal Paper Co.* v. *Nat. Folding Box & Paper Co.,* 226 N. Y. 313; *Hadfield* v. *Colter,* 188 App. Div. 563; *Heller & Bros.* v. *Continental Mills,* 196 App. Div. 7; 233 N. Y. 641; *Rubber Trading Co.* v. *Manhattan Rubber Mfg. Co.,* 221 N. Y. 120; *Henderson* v. *Wilson,* 235 N. Y. 489.)

CRANE, J. The plaintiff (hereinafter called " DeForest "), a Delaware corporation having its principal place of business in New Jersey, was engaged in the manufacture of radios, radio apparatus and accessories. The defendant (hereinafter called " Triangle ") was a New York corporation engaged in the wholesale business of selling radio products to dealers. On September 7, 1922, the parties entered into a written contract in which the plaintiff is referred to as " DeForest " and the defendant as the " Distributor." The main purpose of the contract was to furnish radios to the defendant

upon the terms and under the conditions stated, in order that the defendant might place them upon the New York market and build up a demand for the plaintiff's manufacture among the trade. It was more than a mere sales agreement as it contemplated mutual benefits through the manner and method in which the defendant should handle the product. Increase in demand was anticipated.

Thus the contract starts out by stating that DeForest, desiring to maintain the highest standards in the conduct of sales and the highest efficiency in the service to be rendered the public, in consideration of the agreement of the distributor to actively and aggressively conduct the sale of DeForest products in a dignified manner and render efficient service to the dealer, designates the defendant its distributor in Manhattan and Brooklyn. The fourth paragraph of the agreement reads as follows:

" *Fourth.* Until further notice DeForest hereby agrees to allow the Distributor 50% off list prices. The terms of payment shall be Net 30 days from date of invoice, or 2% discount if the entire account is paid on the tenth of the month following date of shipment. DeForest shall have the right to cancel any orders accepted from the Distributor, and refuse or delay the shipments thereof, if the Distributor shall fail to meet payments promptly, or if the Distributor's financial condition shall be such as in the opinion of DeForest will not warrant further shipments being made to the Distributor."

The Distributor on its part agrees to stock and sell the DeForest products exclusively within the appointed territory, and purchase a complete line of DeForest apparatus at a minimum of $24,000 each and every year during the term of the contract, and not less than $2,000 a month. Sixty days' advance notice of the Distributor's requirements is to be given, and even then, DeForest has the right to make shipments in advance of the Distributor's requirements.

DeForest on its part agrees to give prompt and efficient

service to the end that the defendant's dealers may be faithfully served. The contract is to run for two years with a three-year renewal option. Cancellation of the contract is allowed in these words: " It being, however, understood and agreed, that this contract may be annulled and cancelled at the option of DeForest on ninety (90) days' notice at any time during the term hereof, should the Distributor violate any of the terms."

The contract is to be interpreted and enforced in accordance with the laws of the State of New Jersey.

Upon the establishment of these relations, Triangle undertook to build up a trade in the Brooklyn and Manhattan territory for the DeForest radio products. The purchases far exceeded the contract requirements. In a little more than eight months they aggregated more than $50,000 as against the contract requirement of only $2,000 per month. DeForest was behind in its deliveries.

In May of 1923, while the defendant was in the full performance of all its obligations, the plaintiff deliberately breached and repudiated the contract. That it was forced to do so is beside the point. Injunction proceedings instituted by third parties prevented the plaintiff, so it was claimed, from further performance. As the disposition of this case by the courts below has turned upon the correspondence which thereupon and thereafter ensued, it is necessary, in order to state our position, to refer to portions of the letters.

On May 25, 1923, the plaintiff wrote the defendant:

" We desire to notify you that on May 21, 1923, the Chancery Court of the State of New Jersey granted an injunction to the Radio Corporation of America, enjoining this Company from selling certain apparatus, involving our sets and tubes, except upon written agreement by the purchaser that neither said apparatus as a whole nor any part thereof shall be used in the commercial transmission or reception of messages for pay.   *   *   *

" We very much regret to have to advise you that

under said injunction we will be prohibited from making any further sales of merchandise to you under our contract with you, and that therefore said contract is of no further effect. * * *

" We wish to take this occasion to thank you for the splendid co-operation you have given us in the past and to just add that we trust we will be able to shortly perfect a plan under which we can establish new business relations with you which will continue as profitable to us both as those in the past.

" One of our salesmen will call on you as soon as possible to explain in detail this situation and our new system for the marketing of our merchandise, but in as much as it may take from fifteen to twenty days before he could get around to your territory, we believe it would be to your interest if you could send a representative here for the purpose of taking up this matter without delay."

At the time of the receipt of this letter the defendant had paid the plaintiff all amounts due to date. On June 8 the defendant replied:

" We entered," it said, " into that contract in absolute good faith, upon your representation that you had the exclusive rights to manufacture and deliver the sets and tubes in question under the terms outlined in our contract. We never suspected that you had bargained away your rights to make such a contract with us and that there were superior rights in another. * * *

" After exerting every effort and energy to build up a business consisting of your products, upon the strength of your contract and in reliance upon your promise, you will pardon us for not being able to agree with you in your position that the contract is at an end."

The plaintiff's letter was more than a mere notice of repudiation or refusal to deliver. It was so worded as to intimate, if not to plainly state, that DeForest considered the contract at an end through unavoidable

causes, and that with the acquiescence of the defendant, it would be so considered by both parties. The reply of the defendant was such an one as might be expected from a successful business concern. It notified the plaintiff that the defendant would not acquiesce in any such position and would hold the plaintiff to its obligations. It would not consent to end the contract; the plaintiff could either perform or pay damage.

On or about June 10 a payment became due to the repudiating vendor for goods previously delivered. The defendant refused to pay this amount, notifying the plaintiff that it would hold it as part of the damages which it had suffered and would suffer through the plaintiff's breach. Herman A. Linde, for the defendant, testified.

" Mr. Gilbert [President of DeForest] asked me whether I would be good enough to mail our check for May purchases that night, so that he would receive it the following day as was customary for our concern to do; and I told him that I did not intend to mail the check, that I intended, under advice of counsel, to hold that remittance, to hold that money for damages; that they refused to fulfill what we considered a good and valid contract, and that there wasn't any question but what we were very seriously damaged by their not fulfilling it, and we intended to hold that check as part of our damages."

The plaintiff attempted to make a new and an entirely different contract with the defendant, and negotiations were conducted along that line. The attempt, however, failed, the defendant writing the plaintiff under letter of June 15 to the following effect:

" At the time you placed in our hands forms D. A. and R. A. 1 of your proposed new contract, we had intended in good faith to co-operate with you in working out some solution whereby a new arrangement might be

19

entered into which would safeguard the rights granted to us in our contract dated September 7th, 1922, and which would at the same time protect you from the consequences of the injunction recently granted against you in the Courts of New Jersey.

" Inasmuch as you have assumed the attitude that you will not change a single word in your proposed new agreement which seeks to completely alter our contract relations, there is no alternative but to decline your proposed new arrangement.

" * * * It is difficult to avoid the conclusion that the sole purpose of the new contract is not in good faith to avoid the consequences of an injunction but simply to fling off the obligations of a contract which seems to appeal to you no longer and which we consider to be still equally binding on all concerned."

This correspondence shows that the defendant at all times considered the contract of September 7, 1922, as a good and valid contract; that it refused to consider it as ended, by reason of the injunction proceedings, and that it intended to hold the plaintiff in damages for its breach.

On June 22, 1923, the defendant wrote another letter to the plaintiff stating that pursuant to the terms of the agreement it gave ninety days' notice of a renewal of the contract for a further term of three years, commencing September 7, 1924. This letter was not inconsistent with the position which the defendant had taken ever since the plaintiff's letter of May 25, 1923. The defendant insisted at all times upon its full rights under the agreement and its damages resulting from the breach. At most, this renewal letter was a further claim, if necessary, for all privileges and advantages under the contract as thus extended. The damage resulting from the breach of this contract, having three to four years to run, might be much more than for the balance of the two-year period. If the renewal privilege was worth anything, the defendant insisted upon it.

This action was brought for the purchase price of the goods delivered under the contract and ordered prior to May 25, 1923. The amount did not become due, as before stated, until June 10, 1923, some days after the anticipatory breach. The defendant answered, setting up as a counterclaim its damages sustained by the plaintiff's breach of the contract, as above set forth. As the plaintiff's bill was admitted, the sole question arising at the trial was the validity of the counterclaim. The trial judge took the view that as the defendant had not acquiesced in the abandonment or termination of the contract, but had insisted upon its continuing validity, it was bound to perform its part of the obligation by paying the amount due on June 10, 1923. Adopting the rule of law that a contract is kept alive for the benefit of both parties, the defendant by failing to pay this money, also broke the contract, and, therefore, could not recover. The later breach was considered to have eliminated the first and more damaging breach of the plaintiff, and the counterclaim was dismissed. Such was the view. taken by the courts below.

After the defendant's last letter, referred to as the renewal letter, the plaintiff the next day, on June 23, sent a letter in which it said: " We hereby elect to cancel and annul said contract." No such right of cancellation was contained in the agreement of September 7, 1922. By referring to the cancellation clause, which I have quoted above, it will be noted that DeForest had the right for non-performance of any of the defendant's obligation to give 90 days' notice of cancellation. This cancellation was snapped off at once, giving the impression that the plaintiff's idea of the law and of certain legal phrases was that if the defendant insisted upon keeping the contract alive, it was kept alive for the benefit of the other party to cancel, not to perform. The plaintiff could not perform; it is conceded that the injunction was continued in force and effect during all the times here

mentioned. " Yet," says the plaintiff, " the defendant having kept the contract alive, I could cancel it, though I could not execute it." Such a claim exposes its own weakness, and makes of the law of sales and contracts a mere play for position, rewarding the clever move.

As the case comes before us, with all reasonable inferences to be taken in favor of the appellant, we may summarize the facts as follows: In acknowledging its inability to perform, and stating its refusal to continue further delivery of goods, the plaintiff asked the defendant to consent to the termination of the contract or to make a new contract. The defendant refused to consider the contract terminated, insisted upon its rights, upon performance, or wanted damages. A payment thereafter becoming due for part of the goods purchased, the defendant notified the plaintiff that it would hold the amount as part of its damages resulting from the breach. When sued by the plaintiff for the amount due, the defendant counterclaimed for its damages. What is there here in this brief and concise statement of facts which denies the defendant relief for a conceded loss? What did it do which any reasonable and prudent business man would not have done?

In the first place, the defendant made an election; it elected to consider the contract as valid and binding; it refused to terminate it, and give up its rights thereunder. This is the only election it was called upon to make. Thereafter the contract, so far as the parties were concerned, was an existing contract, as binding after May 25, 1923, as before that date. The plaintiff could at any time have reconsidered and revoked its cancellation, or repudiation and could have entered once more upon the performance of the contract. The defendant's letters held out this offer to it, which if accepted, would have bound the defendant also to continue performance. After the plaintiff's letter, which is referred to as the anticipatory breach, the defendant could at any time have sued for

its damages.   Its delay in so doing afforded the plaintiff an opportunity to repent and to resume the contract. It refused and failed to do so.   To the defendant's demand for damages it has but one defense, and that is the non-payment of a sum of money coming due after the breach.   Payment, it says, should have been made in face of the continuing breach, even though the plaintiff would be under the duty in law and good morals to pay it back to the defendant as damages.   This defense finds no support in law or in reason.

Where one party to a contract repudiates it and refuses to perform, the other party by reason of such repudiation is excused from further performance, or the ceremony of a futile tender.   He must be ready, willing and able to perform, and this is all the law requires.   He is not obliged to go further and perform in the face of a flat refusal and rejection by the other party.   Especially is this so in a case like this where the vendee knows that the vendor is unable to perform, and the latter has so stated. (*Blumenthal & Co.* v. *Gallert & Co.*, 240 N. Y. 217; *Lagerloef Trading Co., Inc.*, v. *American Paper Products Co.*, Circuit Court of Appeals, 291 Fed. Rep. 947; 263 U. S. 706; *Henderson Tire & Rubber Co.* v. *Wilson & Son*, 235 N. Y. 489; *Strasbourger* v. *Leerburger*, 233 N. Y. 55; *Goodyear Tire & Rubber Co.* v. *Vulcanized P. Co.*, 228 N. Y. 118, 125, 126; *Stokes* v. *Mackay*, 147 N. Y. 223; *O' Neill* v. *Supreme Council*, 70 N. J. L. 410; *Holt* v. *United Security Life Ins. Co.*, 74 N. J. L. 795; 76 N. J. L. 585; Williston on Contracts, vol. III, sect. 1303, 1337; 10 Cornell Law Quarterly, p. 135; *British & Beningtons, Lim.*, v. *N. W. Cachar Tea Co.*, 1923 A. C. H. L. 49.)

When, therefore, the plaintiff repudiated its contract on May 25, 1923, and thereafter refused and was unable to perform, the defendant was not obliged to pay the amount coming due June 10 thereafter.   It is conceded that it was ever ready, willing and able to make the payment upon retraction by the plaintiff.   There was

no breach of contract by the defendant, and it was error to dismiss the counterclaim.

This view of the case renders it unnecessary for us to consider whether there were breaches of the contract by the plaintiff prior to May 25, 1923. It is likewise unnecessary for us to determine at this time whether the courts of this State will take judicial notice of the adoption of the Uniform Sales Act in other States and by the State of New Jersey. This contract was to be interpreted according to the laws of New Jersey and the courts below, in the absence of proof upon the subject have proceeded according to the common law. We need not do otherwise. Under the New York Personal Property Law; Cons. Laws, ch. 41 (Sect. 126, subd. 2), sometimes referred to as the Sales Act, non-payment of an installment due cannot always be considered such a material breach as to justify the other party in refusing to proceed. Neither need we analyse this contract of September 7, 1922, to determine whether payment on June 10 was a material and an essential part of the agreement.

By stipulation of counsel the case against the Radio Stores Corporation was tried with this case against the Triangle Radio Supply Co., Inc. The evidence in the one case was to be applicable to the other, although separate verdicts were to be rendered. What I have said, therefore, applies to this other case. The judgment in each case should, therefore, be reversed and a new trial granted, with costs to abide the event.

Cardozo, Pound, Andrews and Lehman, JJ., concur; Hiscock, Ch. J., and McLaughlin, J., dissent.

Judgment accordingly.