**Charles HERMANOWSKI, Plaintiff,**

v.

**ACTON CORPORATION, Defendant.**

**No. 80 Civ. 0333.**

United States District Court,
E.D. of New York.

Aug. 10, 1983.

Hyman & Miner, New York City, for plaintiff.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLASSER, District Judge:

This is an action for breach of contract. The jurisdiction of the Court is based on diversity of citizenship. The case was tried to the Court without a jury and the evidence adduced together with the facts to which the parties stipulated established the following.

On March 19, 1973, the parties entered into a contract by the terms of which the plaintiff was employed as Chairman of the Board, President and Chief Executive Officer of the defendant at a salary of $65,000 per year. The contract was to terminate on December 31, 1976.

On April 11, 1975 a special meeting of the defendant's Board of Directors was convened at the home of the plaintiff. The minutes of that meeting received in evidence (Pl. # 2) reflect that the plaintiff indicated his belief that it would be in the defendant's best interests if he resigned. After extensive discussion, the Board duly adopted a resolution accepting the plaintiff's resignation and in consideration of the termination of his employment contract also resolved to pay him $25,000 and to grant him a five year non-qualified stock option to purchase 50,000 shares of the defendant's common stock at $2.00 per share. A holographic agreement was then

prepared by defendant's counsel and executed by the plaintiff and by an officer of the defendant on its behalf. The portion of that agreement which gave rise to this lawsuit provided that: "As soon as possible after the execution hereof you [defendant] shall issue to me [plaintiff] a five year non-qualified stock option for the purchase of 50,000 shares of [the company's] common stock (unregistered) at $2.00 per share. Said option shall be under the terms of your 1972 non-qualified stock plan."

At the time of the execution of that agreement the defendant had two stock option plans. One was a qualified plan which provided that the option to purchase stock in accordance with its terms automatically expired upon the termination of the option holder's employment or his death. The other was a non-qualified plan by which option rights may be terminated at the election of the company when the employment relationship ended, or at any time within one year by a notice of termination or on 30 days' notice after the expiration of one year.

The events which followed that April 11, 1975 meeting need merely be recited. Seven months later, on December 12, 1975, after numerous requests, the defendant mailed to the plaintiff two copies of a non-qualified stock option certificate which bore the date April 12, 1975. The certificate recited the cancellation provision summarized above. The plaintiff executed the certificates and after the words, "Agreed to" above his signature, typed in the following: "with the proviso that said option is non-cancellable." One copy of the certificate as thus executed was returned to the company with a covering letter dated December 17, 1975 in which the plaintiff unequivocally stated that the cancellation provision in the certificate was invalid and that the option was non-cancellable.

The defendant made no response to the plaintiff's assertion of non-cancellability until June 16, 1976 when, by letter from Samuel Phillips, the President and Chairman of the Board of the defendant company, the plaintiff was advised that the defendant regarded the plaintiff's stock option as cancellable and, by letter dated June 23, 1976, notified the plaintiff that his option would terminate upon the expiration of 30 days.

The plaintiff rejected the defendant's view of the cancellability of his stock option by letter to Mr. Phillips dated July 5, 1976. Receiving no response, he wrote the virtually identical letter to Mr. Phillips again on September 8, 1976. No response was made to that letter either and there was no communication between the parties until on September 28, 1979 the plaintiff forwarded to the defendant a bank check in the sum of $10,000 and requested the delivery of 5,000 shares of the defendant's common stock in partial exercise of his option. Six weeks later, the defendant returned the check to the plaintiff by letter dated November 9, 1979 which read in part: "After searching the records of this corporation, it has been determined that you have no exercisable stock option." This action followed soon thereafter.

The plaintiff contends that the reference to the non-qualified plan in the agreement of April 11, 1975 was a matter of technical necessity for if the option he obtained was pursuant to the qualified plan his option would automatically expire simultaneously with the execution of the agreement which terminated his employment—a consequence obviously not intended. That consideration and that consideration alone prompted the reference to the non-qualified plan.

The defendant's contention is that the reference to the non-qualified plan incorporated all the terms of that plan, including those dealing with the cancellation or termination of the option.

The interpretation of a writing being a matter for the Court, *Gitelson v. Dupont*, 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1969), I have no difficulty in deciding that the reference to the non-qualified stock option plan in the agreement of April 11, 1975 was made in the belief that it was technically necessary for the reasons already explained and not for the purpose of

incorporating by reference all the terms and conditions of that plan. Given the circumstances surrounding its execution, the agreement of April 11th is "instinct with an obligation" of the company to honor the plaintiff's option whenever he chose to exercise it during the ensuing five years. To hold otherwise would require me to believe that the plaintiff, a sophisticated and experienced business man who was President, Chairman of the Board and Chief Executive Officer of a public corporation, released his rights under an unexpired employment contract on which he would receive approximately $100,000 for $25,000 plus an illusory stock option.

■ That the significance of the reference to the stock option plan may be fairly characterized as ambiguous is eloquently attested to by the fact of this law suit and by the diametrically opposite interpretations given to that reference by the parties. Parol evidence of the circumstances leading up to, and attending, the execution of the April 11th agreement is, therefore, clearly admissible to explain the doubtful meaning. *Petrie v. Trustees of Hamilton College*, 158 N.Y. 458, 464, 53 N.E. 216 (1899); J. Prince, *Richardson on Evidence*, § 626 (10th ed. 1973); J. Calamari and J. Perillo, *Contracts*, p. 125 (2d Ed.1977); E. Farnsworth, *Contracts*, pp. 501–507. Accordingly, testimony was received from Abraham Mamber, who was a director of the defendant company and present at the April 11th meeting. He testified that he suggested that stock options be given to the plaintiff in consideration of the termination of the employment contract. He stated that the reasons for his suggestion were that the defendant was cash-poor at the time and granting stock options would be an inexpensive way of settling the contract and still enable the plaintiff to participate in the future of the company. He recalled assurances to the plaintiff that the option was for the full five years and that it was his understanding and the intention of the parties that the option was non-cancellable.

The testimony of Mr. Seymour Koehl was also received. He, too, was a director of the defendant company and present at the April 11th meeting. He proposed the resolution of the board which authorized the stock option granted to the plaintiff and he, too, testified that the option was intended to be iron-clad, non-cancellable for five years.

Neither Mr. Mamber nor Mr. Koehl were familiar with the terms of the company's stock option plans and the reference to the non-qualified plan in the agreement hastily prepared that night had no significance to either of them.

■ Upon all the evidence, I find that the agreement of April 11, 1975 conferred upon the plaintiff a five year irrevocable option to purchase 50,000 shares of the defendant's unregistered common stock at $2.00 per share.

■ Given that determination, the parties differ as to when the agreement was breached and as to the measure of damages. The defendant contends that the breach occurred in December 1975 when the stock option certificate providing for cancellation was sent to plaintiff or, at the latest, in June 1976 when the defendant notified the plaintiff that it cancelled the option. The plaintiff urges that the defendant's June letters cancelling the option were an anticipatory repudiation of the agreement which was breached when, on November 12, 1979, the defendant rejected the plaintiff's exercise of his option to purchase 5,000 shares and returned his check for $10,000.

The option contract is essentially an irrevocable offer by which the defendant promised to sell to the plaintiff 50,000 shares of its unregistered stock, for a price, $2.00 per share. The defendant was bound to perform at the election of the plaintiff who was free to make his election or not as he saw fit. That irrevocable offer was not terminated by the defendant's rejection or revocation communicated to the plaintiff by its letters to him of June 16 and June 23, 1976. An irrevocable offer cannot be unilaterally withdrawn, revoked or rescinded. *Silverstein v. United Cerebral*

*Palsy Assn.,* 17 App.Div.2d 160, 232 N.Y. S.2d 968 (1st Dept.1962); J. Calamari and J. Perillo, *Contracts, supra,* at pp. 90–91, 158; Restatement, Second, *Contracts* § 25(d). Those letters clearly communicated to the plaintiff the defendant's intention not to perform its obligations under the agreement, and it is of no legal consequence that the defendant may claim to have written those letters in good faith. The defendant acted at its peril in repudiating its obligation mistakenly believing it had the right to do so. E. Farnsworth, *Contracts, supra,* at pp. 634–635. Having repudiated its obligation under the terms of the agreement in advance of the time for performance, the defendant made possible one of several responses by the plaintiff. He could have considered the contract breached and claimed damage, he could have insisted that the defendant perform or urge it to retract its repudiation or he could have ignored the repudiation and awaited the time for performance. *Ga Nun v. Palmer,* 202 N.Y. 483, 96 N.E. 99 (1911); *DeForest Radio Tel & Tel Co. v. Triangle Radio Supply Co.,* 243 N.Y. 283, 153 N.E. 75 (1926); E. Farnsworth, *Contracts, supra,* at p. 637; J. Calamari and J. Perillo, *Contracts, supra,* at pp. 465–468.

In response to the June 16th and June 23rd notification of cancellation the plaintiff, by letter dated July 5, 1976 and again on September 8, 1976, in addition to asserting the irrevocability of his stock option wrote: "I would be willing to abandon all rights to the cancelled stock option in return for immediate and full payment of the balance due under my employment contract. Failure to rectify your breach of our agreement will force me to take legal action against you . . . ." The defendant neither retracted its repudiation nor replied. The plaintiff, ignoring the repudiation, thereafter sought to exercise his option and indeed took legal action for the breach of performance by the defendant which I find occurred on November 12, 1979 not only as to the 5,000 shares but as to all the shares the plaintiff was entitled to receive pursuant to the option. There was no necessity for the plaintiff to demand the balance of the shares which, under the circumstances, would have been a futile and meaningless gesture. *See DeForest Radio Tel. and Tel. Co. v. Triangle Radio Supply Co.,* 243 N.Y. 283, 293, 153 N.E. 75 (1926). In finding that the defendant breached the option agreement, I implicitly find that the plaintiff would have been ready, willing and able to perform his obligations under that agreement. The defendant could have retracted its repudiation by transferring the shares the plaintiff demanded, but persisted, instead, in its insistence that it was not obligated to him. See E. Farnsworth, *Contracts, supra,* at p. 638; J. Calamari and J. Perillo, *Contracts, supra,* at p. 465. To recognize June 16 or 23 as the date of breach as the defendant urges would permit the defendant to select the date of breach and thus rob the plaintiff of the value of his option, which, as the defendant's expert, Dr. James H. Scott, Jr. testified, is the right to speculate which it gives the option holder.

■ Having found that the date of breach was November 12, 1979, there remains for determination the measure of damages. Is the measure of damages to be the difference between the market value of the stock on the date of breach and the option price, or the difference between the highest market value of the stock on the date of breach and within a reasonable period of time thereafter and the option price? If the latter, what is a reasonable period of time?

The paucity of authority on this issue is surprising. Most nearly analogous is *Rauser v. LTV Electrosystem, Inc.,* 437 F.2d 800 (7th Cir.1971), in which the Court, applying the law of Indiana, affirmed the district court in awarding damages based on the difference between the option price and the highest intermediate market price between the date of breach and a reasonable time thereafter. In doing so, the Court relied upon two cases, *Citizens' St. R. Co. v. Robbins,* 144 Ind. 671, 42 N.E. 916 (1896) and *B.L. Blair Co. v. Rose,* 26 Ind.App. 487, 60 N.E. 10 (1901), each of which applied the measure of damages for conver-

sion of goods of fluctuating value. It should be noted that the early New York cases which form the nucleus of the authorities on which the plaintiff relies are also predicated upon the tort of conversion of goods of fluctuating value. *See, e.g., Baker v. Drake,* 53 N.Y. 211 (1873) and *Wright v. Bank of the Metropolis,* 110 N.Y. 237, 18 N.E. 79 (1888). The theory of those cases is that the plaintiff should be awarded the damages he would naturally sustain in restoring himself to the position he was in; or, in other words, in *repurchasing* the stock. The assumption is that the plaintiff *owned* the stock wrongfully converted and would go into the market to replace it. 110 N.Y. 237 at pp. 244, 245, 18 N.E. 79. Again at p. 249, 18 N.E. 79: "It is the natural and proximate loss which the plaintiff is to be indemnified for" and that is "the highest price reached within a reasonable time after the plaintiff has learned of the conversion of his stock within which he could go in the market and *repurchase* it." (emphasis added). I am mindful of the sentence at p. 246, 18 N.E. 79 which reads: "In such a case as this, whether the action sounds in tort or is based altogether upon contract, the rule of damages is the same." Cases such as *Scott v. Rogers,* 31 N.Y. 676 (1864) cited by the Court to support that principle are essentially cases in trover and "the form of the action, whether in trover, assumpsit, or case, does not, in general, seem to be material to the question of damages ...." 31 N.Y. 676, 677e. At page 677f, Judge Denio continued: "The case of factors, or other agents, who by their wrongful acts have deprived the owner of property of his right to dispose of it, according to his own views of his interest, stands upon the same footing, in this respect, with that of a purchaser by contract, who has paid the price in advance. Both have an absolute right to judge whether they will dispose of it, at one time or another; and if they are limited to the value, at the time of the wrongful act or omission which creates the cause of action, they will, in many cases, fail to receive adequate indemnity for the injury." *Romaine v. Van Allen,* 26 N.Y. 309 (1863); *Markham*

*v. Jaudon,* 41 N.Y. 235 (1869); *Baker v. Drake,* 53 N.Y. 211 (1873); *Wright v. The Bank of the Metropolis,* 110 N.Y. 237, 18 N.E. 79 (1888); *Jones v. National Chautauqua County Bank,* 272 App.Div. 521, 74 N.Y.S.2d 498 (4th Dept.1947); *Eisenberg v. Haupt,* 235 App.Div. 123, 256 N.Y.S. 411 (2d Dept.1932); *In re Salmon Weed & Co.,* 53 F.2d 335 (2d 1931) and *Gallagher v. Jones,* 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889), all of which buttressed the decision in *Kupferman v. Consolidated Research & Mfg. Corp.,* CCH Fed.Sec.L.Rep. [1961–64 Tr.Binder] ¶ 91,197 at 93,953 (S.D. N.Y.1962) upon which the plaintiff principally relies, were all cases in conversion and applied the measure of damages now generally recognized where goods of fluctuating value are converted.

This is not such a case. The defendant did not exercise unlawful dominion and control over stock which the plaintiff owned or in which the plaintiff had a possessary interest. The defendant was not, therefore, guilty of conversion.

This is an action for breach of contract and the proper measure of damages is determined by the loss sustained or the gain prevented at the time and place of breach. "The rule is precisely the same when the breach of contract is non-delivery of shares of stock. The exceptional instances in which restitution or specific performance are allowed are not applicable to this case .... *Plaintiff was never the owner of the stock of Electrospace just because the defendant breached its contract to deliver the shares.* That breach and the loss caused was fixed and determined [when the] plaintiff's cause of action accrued.... That was, therefore, also the time when the value to him of the plaintiff's performance was to be measured. It was then that the plaintiff was to be made whole and not at some future time never specified in the agreement." (emphasis added) (*Simon v. Electrospace Corporation,* 28 N.Y.2d 136, 145, 146, 320 N.Y.S.2d 225, 232, 233, 269 N.E.2d 21, 26, 27 (1971)).

In *Rosen v. Duggan's Distillers Products Corp.,* 23 App.Div.2d 635, 256 N.Y.

S.2d 950 (1st Dept.1965), a stock optionee brought an action against a corporation for damages for not complying with an option. The measure of damage, said the Court, was the difference between the market price of the shares of stock at the time fixed for delivery and the option price. *See also, Direction Associates, Inc. v. Programming Systems*, 412 F.Supp. 714, 718 (S.D.N.Y.1976).

Having determined that the date of breach was November 12, 1979, the date on or about which plaintiff learned that the defendant breached the agreement; that the measure of damages should be determined as of that date and that the measure of damages is the difference between the option price and the market value of the stock, that sum must now be ascertained. To begin with, although the stock option initially embraced 50,000 shares when it was given in April 1975, as of November 12, 1979, it embraced 60,500 shares by virtue of a 10% stock dividend declared in 1978 and another in 1979. Proportionate adjustments of all outstanding stock options were made by the defendant as necessitated by those stock dividends.

On November 12, 1979, the defendant's stock was traded on the American Stock Exchange at a high of $12.125 and a low of $11.50. The average is thus calculated to be $11.8125. Because the stock embraced by the option was "restricted stock," the experts for the parties agreed that a discount should be applied to determine the value of such stock although they differed as to the amount of the discount. The plaintiff's expert testified that a discount of 25% was appropriate. The defendant's expert's opinion was that a 30% discount was appropriate, conceding, however, that the opinion of the plaintiff's expert was not unreasonable. After consideration of the testimony of each, I adopt the view of the plaintiff's expert and apply a discount of 25%, which fixes the price per share at $8.86. The plaintiff's damages, therefore are 60,500 shares multiplied by $8.86, or $536,030 minus the option price of $121,-000, leaving a balance of $415,030. Interest on that sum shall be computed as of November 12, 1979. N.Y.C.P.L.R. § 5001(a).

No evidence having been submitted on the defendant's counterclaims, they are hereby dismissed.

The foregoing constitute the findings of fact and conclusions of law in accordance with Rule 52 F.R.Civ.P.