Abdallah W. TAMARI, Ludwig W. Tamari, and Farah W. Tamari, co-partners d/b/a Wahbe Tamari & Sons Co., Plaintiffs–Appellants,

v.

BACHE & COMPANY (LEBANON) S.A.L., a Lebanese corporation, Defendant–Appellee.

No. 87–1388.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1987.

Decided Jan. 20, 1988.

---

Steven A. Weiss, Schopf & Weiss, Chicago, Ill., for plaintiffs-appellants.

Lawrence M. Gavin, Bell, Boyd & Lloyd, Chicago, Ill., for defendant-appellee.

Before POSNER, EASTERBROOK, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

This commodities litigation, now in its thirteenth year, reverberates with echoes from the civil war in Lebanon. The plaintiffs are a family of wealthy Lebanese merchants who at the time of suit did, and still do, trade vast quantities of soybeans and other commodities throughout the Middle East. (For example, they sell 50 percent of all the foodstuffs sold in the Kingdom of Jordan.) They began trading commodity futures in the 1960s if not earlier, maintaining commodity future trading accounts with a number of brokerage houses including the defendant, the Lebanese affiliate of Bache & Co. ("Bache Lebanon"; the American branch is "Bache Delaware").

On May 1, 1973, the Tamaris held very large "short" positions in July, August, and November soybean futures, meaning they had committed themselves to deliver soybeans in these months at a fixed price. If the market price of soybeans fell, they would make a profit; if it rose, a loss. On May 9, at a luncheon at their home in Beirut, the Tamaris met with their Bache Lebanon representative, Gelad, and told him to close out their short positions. Gelad left for his office, but en route was delayed at a military checkpoint and did not arrive at his office until shortly before 4 p.m.—10 a.m. in Chicago, where soybean futures are traded on the Board of Trade. By this time, according to Gelad's testimony, soybean futures were "limit up." The rules of commodity exchanges such as the Board of Trade limit the range within which price is permitted to vary during a single trading day. When price hits the day's limit—which often happens early in the day—the market for the commodity in question is said to be "limit up," meaning that no trades may be made at a higher price until the exchange opens the next

day. Sometimes it is impossible to close out a short position when the market is limit up. Anyone who thinks the price will open higher the next day will be reluctant to pay the limit price, for that would commit him to agreeing to deliver the commodity at a price that he believed to be just an artifact of the limit rules rather than a true current market price.

At all events, when Gelad discovered that the market was limit up, he did not attempt to close out the Tamaris' short positions, and he so informed them. Nor did he put in a continuing order, which would have resulted in closing out the position the next day when the market opened. He did, however, persuade the Tamaris to go long on September soybean futures. Since the Tamaris were not short on September futures, this investment created a "straddle," which means the investor takes opposite positions in contracts with different delivery dates, so that he is partially hedged against price changes.

The market indeed rose the next day but on May 11 the price fell back to what it had been on the ninth and the Tamaris told Gelad they were glad he hadn't succeeded in closing out their short position. Afterward the price rose again and soon the Tamaris' account was under-margined. Ordinarily Bache would have liquidated the account—and had it done so here would have saved the Tamaris a lot of money—but it held back at the Tamaris' urging because the Tamaris considered that the liquidation of their account would be a humiliation to them.

On May 22 the Tamaris reconsidered their short position and told Rochon, whom Bache Delaware had sent to Lebanon to assist with the Tamaris' account, to close out all of their short positions forthwith. Rochon delayed—we may assume, without having to decide, negligently—and because the market kept on rising the Tamaris lost more money.

Bache Delaware initiated arbitration to collect from the Tamaris money that it had lost in the collapse. The Tamaris counterclaimed, charging fraud, and also filed a suit in federal district court to enjoin the arbitration; Bache Lebanon was named as an additional defendant. This suit was dismissed for failure to state a claim, and we affirmed. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 565 F.2d 1194 (7th Cir.1977). The arbitration went forward, and resulted in an award in favor of Bache Delaware. The Tamaris sued in federal district court to set the award aside. The district court dismissed the suit for failure to state a claim, and again we affirmed. *Tamari v. Bache Halsey Stuart Inc.*, 619 F.2d 1196 (7th Cir.1980).

The Tamaris brought the present suit in 1975. It charges Bache Lebanon with fraud in violation of the Commodity Exchange Act and of state common law, and seeks several million dollars in damages. Although all the parties are nonresident aliens and the suit arises out of their dealings in a foreign country, we held in an interlocutory appeal from the denial of a motion to dismiss that the district court had subject-matter jurisdiction. *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103 (7th Cir.1984). In 1985 the district judge ruled that the complaint charged only fraud, not negligence; she refused to allow the Tamaris to amend the complaint to add a negligence count. At the conclusion of a bench trial on the fraud issues, the judge issued an oral opinion exonerating the defendant.

Unless the judge committed reversible error by refusing to allow the Tamaris to assert a claim of negligence, it is difficult to see how they can get to first base on this appeal. Even if Gelad should not have desisted from trying to execute the Tamaris' sell order on May 9 when he found that the market was limit up—for there might have been a buyer: someone who thought the market would open lower the next day—at worst this would be negligence, not deliberate wrongdoing. Cf. *Zurad v. Lehman Bros. Kuhn Loeb Inc.*, 757 F.2d 129, 133 (7th Cir.1985). There is no evidence that Gelad deliberately refused to carry out the instructions of these most valuable customers. If he had wanted to do this, the easiest way would have been to tarry a little while longer at the checkpoint.

The purchase of a straddle is not a suspicious circumstance. September futures were not yet limit up. So by taking a long position in them on behalf of the Tamaris, Gelad could, without having to pay a limit-up price, go some way toward protecting the Tamaris against a rising price; for the price of September soybean futures was likely to be positively correlated with that of August soybean futures, which the Tamaris had shorted.

In a last-ditch effort to prove fraud the Tamaris submitted to this court an exhibit, which they had not introduced in the district court, that purports to show that November futures were not limit up on May 9 until very late in the trading day, making Gelad's failure to close out the Tamaris' short position in those futures incomprehensible, undermining his entire testimony, and strengthening the inference of fraud. The exhibit is a handwritten purported record of transactions in soybeans futures on the Chicago Board of Trade on May 9, 1973. The Tamaris ask us to take judicial notice of it. This we cannot do, and not only because no effort was made to show that the document is a fact source "whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2); cf. *Baumel v. Rosen*, 283 F.Supp. 128, 133 n. 8 (D.Md. 1968), aff'd in part, rev'd in part, on other grounds, 412 F.2d 571 (3d Cir.1969). The exhibit was available to the Tamaris at the time of trial, but they decided for their own reasons not to place it in evidence. They cannot ask us to reverse the district judge on the basis of evidence that they deliberately withheld from her. That would be sandbagging of the worst kind. A litigant cannot put in part of his case in the trial court and then, if he loses, put in the rest on appeal. See Fed.R.App.P. 10(a); 7th Cir.R. 10; *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 636 (7th Cir.1987); *Henn v. National Geographic Society*, 819 F.2d 824, 831 (7th Cir.1987).

At all events, Gelad's failure to close out the short position on May 9 was a harmless—one might even say a happy—error for the Tamaris. For on May 11 they decided it was a good thing that Gelad had not carried out their order; they had changed their minds and now wanted to remain short. The Tamaris point to cases holding that if a broker wrongfully sells a customer's securities, the customer is entitled to calculate his lost profits on the basis of the highest value that the securities reached between the time when the wrongful sale took place and the time when the customer, having learned that the securities had been sold, should, as a reasonable person, have replaced them. See, e.g., *Galigher v. Jones*, 129 U.S. 193, 200–01, 9 S.Ct. 335, 337–38, 32 L.Ed. 658 (1889); *Schultz v. CFTC*, 716 F.2d 136, 139–41 (2d Cir.1983); *Rauser v. LTV Electrosystems, Inc.*, 437 F.2d 800 (7th Cir.1971); *Chipser v. Kohlmeyer & Co.*, 600 F.2d 1061, 1067–68 (5th Cir.1979); *Letson v. Dean Witter Reynolds, Inc.*, 532 F.Supp. 500 (N.D.Cal.1982), aff'd without opinion under the name of *Shearson Loeb Rhoades, Inc. v. Bryant*, 730 F.2d 769 (9th Cir.1984); but see *Hermanowski v. Acton Corp.*, 580 F.Supp. 140, 145–46 (E.D.N.Y.1983). Thus, if the broker sold his customer's stock on May 1, when the market price was $20; the price rose on May 2 to $25; and the price fell to $21 on May 3 when the customer learned of the sale and replaced the stock, his damages would be $5 per share, not $1. This is a generous—maybe too generous—measure of damages; it assumes that the customer would have had the clairvoyance to sell when the stock hit its peak during the relevant period, and by so assuming systematically overcompensates defrauded investors. At all events it has no application here. If Gelad had executed the Tamaris' order on May 10, when the price of soybean futures was higher than it had been the previous day or would be the next day (when the Tamaris changed their mind about liquidation), he would have generated losses, not profits, for the Tamaris. For the order was to liquidate a short position, and a rise in price raises the cost of liquidating such a position. By waiting until price fell back on the eleventh Gelad saved the Tamaris money, and his employer should not be penalized.

It is true that if Gelad had closed out the Tamaris' short position on the tenth, they might not have gone short on the eleventh. And if not, it might seem that Gelad hurt them after all, since the price when their short position was finally liquidated at the end of May was higher than it had been when it was at a temporary peak on the tenth. But the Tamaris could not, simply by ratifying Gelad's May 9 dereliction of duty, make him their insurer against the market's rising after May 11—for if it fell they would make profits that they did not propose to share with Bache. There can likewise be no liability for Bache's honoring their request not to liquidate their account when it became undermargined. Any losses due to this request were self-inflicted. It is not irrelevant that the Tamaris may well be the largest commodity traders in the Middle East. They knew the risks they were taking by staying in the market while the price was moving against them.

Any claim of wrongdoing based on Rochon's conduct on and after May 22 is foreclosed by the district judge's finding, which is not clearly erroneous, that Rochon was an agent of Bache Delaware. It is true, but irrelevant, that Rochon might also have been an agent of Bache Lebanon. The significance of his being an agent of Bache Delaware is that the Tamaris had, as noted earlier, arbitrated their dispute with Bache Delaware over the failure to close out their short position—and lost. The arbitrators issued no opinion, but in finding no liability by Bache Delaware to the Tamaris they necessarily found that Bache Delaware's agents had not acted wrongfully; for if those agents had acted wrongfully, their wrongdoing would have been imputed to Bache Delaware by the principle of respondeat superior. See *Rosenthal & Co. v. CFTC*, 802 F.2d 963 (7th Cir.1986). That meant Rochon was "clean." Of course if he acted sometimes for Bache Delaware and sometimes for Bache Lebanon, the fact that he committed no torts imputable to Bache Delaware would not exonerate him from liability for torts committed in his capacity as an agent for Bache Lebanon. But the Tamaris do not contend that Rochon divided his time between his two principals; they contend only that at the relevant time he was acting for both at once. There was thus a single course of conduct, which the arbitrator necessarily found was not tortious conduct—provided Rochon was one of Bache Delaware's agents. And he was. This finding precludes relitigation of the issue in the present suit. (Bache Lebanon was named as a defendant in the Tamaris' suit to enjoin the arbitration, though never served; whether it was nevertheless entitled to plead the final judgment in that suit as res judicata, and if not whether it was in privity with Bache Delaware for purposes of res judicata, are not issues we need resolve.)

■ None of the other alleged frauds merits discussion, and we move to the question whether the district judge abused her discretion in refusing to allow the Tamaris to proceed also on the ground of negligence. The complaint charged federal commodities fraud and state common law fraud. There was a reference to breach of fiduciary duty by Bache Lebanon, and such a breach could of course result from negligence; but the reference was in connection with the charge of commodities fraud, not common law fraud; and for commodities fraud, negligence is not enough. See *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 822–23 (10th Cir.1986), and cases cited there. It was only after ten years of litigation and with only six weeks to go before the trial was finally to begin (though it was later postponed for almost a year) that the plaintiffs first indicated that they intended to prove Bache Lebanon's negligence, as distinct from its fraud. In these circumstances we are reluctant to conclude that the district judge abused her discretion. Yet it is hard to see what prejudice would have ensued from allowing the Tamaris to add the extra string to their bow, especially when the trial was to be postponed for a substantial time. At argument Bache Lebanon's counsel was unable to come up with persuasive suggestions of what additional discovery he would have wanted to pursue had he known that he would have to defend his client against

charges of negligence as well as fraud. One can imagine evidence being put in concerning the standard of care to be expected of commodity brokers in executing orders promptly, using straddles as a method of limiting a client's risk, and coping with the complexities introduced by limit-up conditions, but we are left with some doubt whether either party intended to get into these matters. However, when ten years into a commercial suit the plaintiffs have not yet made clear the range of theories they want to litigate, a district judge is entitled to become impatient, and, anticipating inevitable further delays from a significant shift in the theory of the case, to refuse to give the plaintiffs the leeway sought.

Thus, though as in *Bohen v. City of East Chicago*, 799 F.2d 1180, 1184–85 (7th Cir. 1986), "We find it difficult from our perspective on appeal to see any great hardship that [the plaintiff's] amended complaint would have placed on the defendant or the judicial system," to disagree with the judge's action and to find that it was an abuse of discretion are two different things. And as the quoted passage indicates, the burden to the judicial system from allowing parties to change theories in midstream is a pertinent factor and may in appropriate cases justify a refusal to allow an amendment even if the amendment would cause no hardship at all to the opposing party. See also *Daves v. Payless Cashways, Inc.*, 661 F.2d 1022, 1024–25 (5th Cir.1981).

A number of cases say that delay by itself does not justify denying a motion to amend a pleading, in view of the statement in Fed.R.Civ.P. 15(a) that "leave [to amend] shall be freely given when justice so requires." See, e.g., *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 279–80 (4th Cir.1987); *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1493 (9th Cir.1987); *Carson v. Polley*, 689 F.2d 562, 584 (5th Cir.1982); *Gregg Communications Systems, Inc. v. American Tel. & Tel. Co.*, 98 F.R.D. 715, 721 (N.D.Ill.1983). This no doubt is true; but the longer the delay, the greater the presumption against granting leave to amend. The longer the delay in

seeking leave to amend, the likelier is it both that the delay is inexcusable (it should not have taken the Tamaris' counsel *ten years* to figure out they might have a negligence claim against Bache Lebanon) and that granting leave to amend will, by further delaying the lawsuit, impair the public interest in the prompt resolution of legal disputes. The interests of justice go beyond the interests of the parties to the particular suit; all other considerations to one side, delay in resolving a suit may harm other litigants by making them wait longer in the court queue. Hence, when extreme, "delay itself may be considered prejudicial," *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 139 (1st Cir.1985), and Judge Getzendanner was entitled to conclude that this was such a case. Cf. *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1163–64 (5th Cir.1982); *Paschal v. Florida Public Employees Relations Comm'n*, 666 F.2d 1381, 1384 (11th Cir. 1982) (per curiam).

AFFIRMED.