**Edward E. LUCENTE, Plaintiff,**

**v.**

**INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.**

**No. 99 Civ. 3987(CM).**

United States District Court, S.D. New York.

July 16, 2001.

David Quittmeyer, Douglas L. McCoy, George M. Walker, Hand Arendall, L.L.C., Mobile, AL, for plaintiff.

Peter T. Barbur, Cravath, Swaine & Moore, New York City, for defendant.

## DECISION AND ORDER CALCULATING DAMAGES AND ENTERING JUDGMENT

McMAHON, District Judge.

Following this Court's May 1, 2001 decision, which disposed of plaintiff's motion for reconsideration, the parties were instructed to file a stipulation as to certain facts that might enable the Court to calculate plaintiff's damages in accordance with my earlier opinions. The parties were unable to comply with my order, and filed opposing "stipulations"[1] concerning the damages that plaintiff suffered when he attempted to exercise his option to purchase 60,692 shares of IBM stock on January 16, 2001. There are, however, certain key facts on which both sides agree.

For example, there is no dispute that, in January 2001, plaintiff's remaining option to purchase IBM stock was, by virtue of intervening stock splits, worth 60,692 shares; that the option had an expiration date of January 28, 2001; and that plaintiff attempted to exercise that option on January 16, 2001. (It is not entirely fair for the Court to say that there is no dispute about these matters, since IBM continues to insist that it lawfully cancelled plaintiff's options in 1993. However, I have ruled otherwise, and until I am reversed, IBM must operate within the parameters of my decision.)

Both sides also agree that, on the date plaintiff attempted to exercise, an IBM optionee could choose one of three alternative methods of exercising an option: (1) a "market sell order," whereby the employee or retiree would direct Salomon Smith Barney (which administered IBM's stock option program) to exercise options and sell shares simultaneously, receiving a cash payment of the difference between the cost to exercise and the sale proceeds (minus taxes and fees); (2) an "exercise to sell and cover," whereby the employee or retiree exercises the options, sells enough shares to cover the costs of the exercise (including taxes and fees) and receives the remaining shares of stock; and (3) an "exercise and hold," whereby the employee or retiree

---

**1.** It stands to reason that factual statements as to which there is no agreement cannot be called "stipulations." I am treating the opposing filings as Statements of Undisputed Fact pursuant to Local Rule 56.1.

exercises the options and holds all of the remaining shares, paying the exercise cost and any required taxes. Finally, the parties also agree that under all three scenarios, the exercise transaction settles three days later, at which time the employee or retiree receives the cash or shares of stock to which he is entitled.

Given that none of the above facts are contested, no *genuine* issue of material fact relating to damages is in dispute.

### 1. Stock Options

■ IBM contends that there is a disputed issue of fact concerning which of the three methods of exercise plaintiff used when he attempted to exercise on January 16, 2001. But there can be no dispute as to which method of exercise Lucente was attempting. In his letter to Louis V. Gerstner, Jr., Chief Executive Officer of IBM, dated January 16, 2001, Lucente wrote: "Please have IBM issue a certificate (or other appropriate form of recognition of my ownership) for 60,692 shares and send that certificate to my attorneys ..." This request can only be interpreted as a request to "exercise and hold." Plaintiff specifically asked that IBM send shares of stock to the custody of his lawyer. He did not ask that any of the stock be sold to cover the exercise price; he tendered a check for the full exercise price ($1,889,948.88), and did not indicate any intention to sell the shares. Thus, IBM's

fall-back position, that plaintiff exercised a market sell order, which would entitle him to $3,746,820.62—is also untenable.[2] Accordingly, "exercise and hold" is the only possibility here, and no reasonable juror could have concluded otherwise.

Plaintiff argues that, in view of my earlier opinions, he is entitled to recover $5,310,550 under the highest intermediate price rule, which affords him the highest market value for the shares within a reasonable time after IBM rejected his option exercise tender.[3] *See, e.g., Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 535 (S.D.N.Y.2001) (applying the "highest intermediate price" rule to a breach of contract action).

■ Plaintiff's analysis is also incorrect. Insofar as the stock options are concerned, this action is governed by the rule set forth in *Hermanowski v. Acton Corp.*, 580 F.Supp. 140 (E.D.N.Y.) *aff'd in relevant part*, 729 F.2d 921 (2d Cir.1984), a similar case which measured damages for refusal to honor a stock option from the date of the breach. In *Hermanowski*, plaintiff forwarded to defendant a check in the sum of $10,000 on September 29, 1979, and requested the delivery of 5,000 shares of defendant's common stock in partial exercise of his option. *Id.* at 142. Defendant later returned the check, stating that "it has been determined that you have no exercisable stock option." *Id.* The court

**2.** This is calculated on the basis that the cash payment to Lucente would be equal to the difference between the value of the shares sold by Lucente on January 16, the date of Lucente's exercise ($5,636,769.50 or 60,692 shares times $92.875 per share) and the amount that Lucente would have had to pay to exercise his options ($1,889,948.88). Why IBM believes that January 16 is the relevant date—since it admits that January 19 would be the closing date—is unexplained, but obvious, given the jump in IBM's stock price between January 16 and January 19.

**3.** Plaintiff's number of $5,310,550 is derived from the market high share price within a "reasonable time" ($118.64 on February 15, 2001). Under this calculation, the payment to Lucente would be the difference between the value of the shares sold by Lucente on that day ($7,200,498.88 or 60,692 shares times $118.64 per share) minus the amount tendered by Lucente ($1,889,948.88).

fixed the date of the breach (and measured damages) on November 12, 1979, the date when plaintiff learned that defendant rejected the tender. *Id.* at 143.

Applying *Hermanowski* to the case at bar, Lucente's damages must be measured at the date of IBM's breach, not at the time of the highest market value within a reasonable time after the tender was rejected. That date, it appears, was January 19, 2001, when Lucente should have received his shares.[4] The "highest intermediate price" rule has no applicability here.[5]

■ As his fall-back position, plaintiff argues that his was an "exercise and hold" order, and that he is entitled to $4,824.067.62 for his attempt to exercise on January 16, 2001. Plaintiff's fall-back position is correct.

As explained above, plaintiff attempted to exercise his options on January 16, 2001 by making an "exercise and hold" order. Because it would have taken three days for IBM to deliver the shares to Lucente, his damages are measured as of January 19, 2001. On January 19, 2001 (the assumed date of delivery), IBM shares were selling at an average of $110.59375 per share. Multiplying the average share price by 60,692 shares, the value of the options were $6,714,052.50. Minus the strike price ($1,889,948.88), plaintiff is entitled to $4,824,067.62.

■ Prejudgment interest on money damages is a matter of right, and the statutory rate is 9% per annum. *See* N.Y.C.P.L.R. § 5001 and § 5004. Therefore:

| | |
|---|---|
| Value as of January 19, 2001, net of strike price: | $4,824,067.62 |
| Prejudgment interest at 9% per annum from January 19, 2001 through July 10, 2001 | $ 204,593.34 |
| Prejudgment interest from July 11 through July 16, 2001: ($1,189.4962 per diem) | $ 7,136.98 |
| **Total:** | **$5,035,797.94** |

2. Restricted Stock

■ As set forth in the May 1, 2001 opinion, the damages were $733,909.25 for stock which would have been sold on December 17, 1993—a date that this Court concluded was within a "reasonable period" after learning that the restrictions on the shares had been lifted.

| | |
|---|---|
| Value as of December 17, 1993 | $ 733,909.25 |
| Prejudgment interest at 9% per annum from December 17, 1993 through July 10, 2001 | $ 499,460.43 |
| Prejudgment interest from July 11 through July 16, 2001: ($180.9639 per diem) | $ 1,085.78 |
| **Total:** | **$1,234,455.46** |

## CONCLUSION

Accordingly, plaintiff is entitled to $5,035,797.94 (option damages) plus $1,234,455.46 (restricted stock damages), for a total of *$6,270,253.40*. The Clerk is directed to enter judgment in plaintiff's favor for $6,270,253.40, and to close the case.

This constitutes the decision and order of the Court.

---

4. To the extent that the parties have agreed that January 19, 2001 (three days after the attempted exercise) was the date of dishonor, I amend my May 1, 2001 decision to change the date of breach from January 23, 2001 to January 19, 2001.

5. That rule was applicable to plaintiff's shares of restricted stock, for reasons stated in my May 1, 2001 opinion.